# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

November 29, 2016

————

No. 15-41432

————

Lyle W. Cayce
Clerk

JOSHUA MONTANO, as the Personal Representative of the Estate of Robert
Montano; DANIEL MONTANO; KAYLYNN MONTANO; MARIA MONTANO;
BONNIE WALLACE, as Next Friend of MAC, a minor,

> Plaintiffs - Appellees Cross-Appellants

v.

ORANGE COUNTY, TEXAS,

> Defendant - Appellant Cross-Appellee

————

Appeals from the United States District Court
for the Eastern District of Texas

————

Before JOLLY, BARKSDALE, and SOUTHWICK, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

These cross-appeals arise out of the tragic death of Robert Montano, a pretrial detainee in the Orange County, Texas, jail. He died of acute renal failure after approximately four-and-one-half days' detention in a glass-walled observation cell—the "bubble"—in the jail's infirmary. The bubble was used to observe detoxifying pretrial detainees. During Mr. Montano's detention, he consumed little, if any, food or water; his vital signs were checked once at most; he was never seen by a physician; and emergency care was requested by the jail staff only minutes before his death.

No. 15-41432

Primarily at issue is whether sufficient evidence supports a jury's finding Mr. Montano was subjected to an unconstitutional condition of confinement in that detoxification-observation cell, causing his death. Based on the jury trial and the district court's post-verdict rulings on the county's pre- and post-verdict motions, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law (JMOL), among the issues presented are the court's: granting the Rule 50(a) motion against the jury's award of wrongful-death damages; denying the Rule 50(b) motion on the claims for unconstitutional-confinement and damages for pain; and denying the Rule 59 alternative new-trial motion (permitted by Rule 50(b)). AFFIRMED in part; VACATED in part; REMANDED.

I.

Mr. Montano was arrested early Friday evening, 7 October 2011, for public intoxication. Later that evening, a county judge signed an affidavit of probable cause, setting bond at $200 and ordering Mr. Montano to be released after 72 business hours if charges were not filed or bond posted.

Although Mr. Montano had been arrested for public intoxication, the arresting officer reported to the corrections officer working the book-in desk that she suspected he was under the influence of bath salts. (Although Mr. Montano was partially booked into the infirmary, he was not booked into the general population; the latter required his being coherent). Bath salts are a "designer drug", manufactured to have similar properties to illegal substances such as speed or cocaine. Intoxication from bath salts is a serious condition, rendering symptoms such as high blood pressure, hypothermia, paranoia, and sometimes death.

The arresting officer's bath-salts suspicion was never confirmed, but spread as if wholly true—from Mr. Montano's intake through the county's briefs here. Even the coroner officially declared Mr. Montano's renal failure

2

was due to bath-salts toxicity; but, at trial, he admitted he had only perpetuated the theory given him.

Mr. Montano had been previously treated for mental illness, and his treatment was noted in a state mental-health database. The county, however, did not comply at intake with the Texas Commission on Jail Standards' requirement to run a database query, known as the Continuity of Care Query.

In addition, just one month prior to his fatal detention, Mr. Montano had been detained in the county's jail, under the assumed influence of bath salts. Then, by contrast, he was placed in a restraint chair—not in the bubble—and calmed down within hours.

On 7 October, Mr. Montano was placed in the observation cell because, as noted *supra*, he was determined to be incoherent and, therefore, unable to complete the booking process. In the bubble, he was to be observed by licensed vocational nurses (LVN). An LVN, the Texas equivalent of a licensed practical nurse, receives nine months' training in a certificate program, and provides basic medical monitoring under the supervision of physicians or registered nurses. For the jail, two contract physicians served as immediate medical supervisors to the LVNs; no registered nurses worked on site. A registered nurse, testifying as an expert witness for plaintiffs, opined the county's LVNs practiced independent assessments and were not directly supervised by physicians, in contravention of the Texas Administrative Code.

The medical "supervision" was sporadic. Neither physician maintained a daily presence on site. Instead, they generally visited the jail weekly, though not on a consistent day of the week; ten days sometimes passed between visits. For day-to-day operations, one LVN supervised the others; and separate from medical supervision, a lieutenant-rank jail officer served as the supervising LVN's "corrections supervisor".

No. 15-41432

No contract physician visited the jail during Mr. Montano's approximate four-and-one-half-days' detention. Conflicting testimony was presented on visiting physicians' usual attention to pretrial detainees in the observation cell. One LVN testified every detainee in the observation cell was automatically seen when a physician visited. On the other hand, the supervising LVN testified: physician assessments were contingent upon detainee requests or LVN determination; and, when the physicians visited, they did not so much as check the medical charts of patients in the infirmary. Moreover, even the supervising LVN did not review the charts of her supervisees.

Attention to Mr. Montano was minimal at best. Jail personnel failed to prepare a required suicide-risk form for Mr. Montano, a repeat omission of which the jail had been made aware just four months earlier when a random inspection by the Texas Commission on Jail Standards noted missing suicide-screening assessments, separate from the earlier-referenced required database query for mental-health records. Two jail employees were later disciplined for failing to complete Mr. Montano's screening. While the county's health-services plan required written observations of suicide-risk detainees every 15 minutes, the county admits written observations of Mr. Montano were recorded only approximately every 30 minutes.

Until the morning of Mr. Montano's death on 12 October, no member of the jail staff entered the bubble to attempt to assess him. And, he was not so much as within view unless standing. Uncontroverted testimony shows paper was taped to the bubble's glass walls. In that regard, while every related photograph in evidence (taken by a Texas Ranger who investigated the scene) shows the paper was taped all the way to the floor, and an LVN admitted paper taped that way would prevent any view of Mr. Montano when lying down or crawling, another LVN insisted the photographs were inaccurate and the paper did not extend to the floor.

4

As developed at trial, pursuant to Rule 32(a)(2), to demonstrate the inconsistency between an LVN's deposition and trial testimony, she had testified in her deposition that she was familiar with Mr. Montano and knew at the time of his detention not only that he suffered from depression and schizophrenia, but that he also had a history of psychiatric care. But, as she testified at trial, she never documented what she knew during the course of Mr. Montano's fatal detention; instead, she deferred to the never-substantiated theory that he was high on bath salts over her personal knowledge of his condition and treatments. And, in her trial testimony, she forgot precisely how much prior knowledge she possessed about Mr. Montano's mental condition, though she did allow that he told the staff at intake he was schizophrenic. At trial she explained the inconsistency between her deposition and trial testimony by stating she had been "very ill" during the former.

The supervising LVN testified that, when she arrived at work Monday morning, 10 October, and was alerted to Mr. Montano's condition, she did not so much as review his medical chart—despite his being the only detainee in the bubble. After Mr. Montano's death, the supervising LVN testified she never reviewed the work of the LVNs for mistakes during his detention. While the county would have her omission demonstrate a one-time incident of negligence, she testified that her behavior was consistent with general staff conduct.

Mr. Montano's vital signs were checked once at most; and, even in that instance, his temperature was not taken. Food was offered through a slot in the door. After reviewing Mr. Montano's medical records, a doctor, testifying as an expert witness for plaintiffs, summarized Mr. Montano's detention: the jail staff "basically . . . watched [Mr. Montano] and his condition deteriorate until the point where he died".

5

No. 15-41432

Late Tuesday evening, more than four days into Mr. Montano's detention, one of the LVNs heard him say "come in". The LVN testified it never crossed her mind that his request was directed at her. She took no action, and told no one of his request until after his death, when she deemed the request worth mentioning to the investigating Texas Ranger. While the LVN offered consistent testimony on her first day of trial testimony, on her second she recanted, stating she never heard Mr. Montano say "come in".

On 12 October at 4:58 a.m., after Mr. Montano had been detained almost four-and-one-half days in the bubble, which was littered with uneaten food and human waste and which did not have a sink, toilet, or toilet paper, an LVN observed from outside the bubble that he did not appear to be breathing. That LVN called the jail control room and spoke with a corporal, then waited 20 minutes for his arrival before calling an ambulance or entering the bubble. Mr. Montano was pronounced dead 34 minutes later.

This 42 U.S.C. § 1983 action was filed against the county on three theories of liability: unconstitutional condition of confinement relative to a county custom for holding incoherent pretrial detainees; episodic acts or omissions; and unconstitutional condition of confinement relative to a county custom of failing to meet basic human needs.

The jury trial began on Monday, 2 February 2015; plaintiffs rested on the 9th; and the county rested on the 10th. Sixteen witnesses testified. The county presented a written Rule 50(a) motion for JMOL at the close of plaintiffs' case, and re-urged it at the close of all the evidence. In each instance, the court reserved ruling on the motion until after the jury rendered its verdict.

On the 11th, after deliberating for 11 hours, the jury found liability and damages on the first two theories. It found the constitutional-right violation proximately caused physical pain and death, but not mental anguish, and awarded, *inter alia*, $1.5 million for pain, and $917,000 for wrongful death.

No. 15-41432

(Subsequently, the court awarded plaintiffs $440,116.01 for attorney's fees and costs.)

Addressing post-verdict the above-described Rule 50(a) motion, the court, in an extremely detailed and comprehensive opinion, ruled plaintiffs presented sufficient evidence to support the verdict on both the unconstitutional-condition-of-confinement claim and survival damages, but insufficient evidence to support the verdict on the episodic-acts claim and wrongful-death damages.  (The ruling against the episodic acts finding, is not at issue on appeal.)  For the wrongful-death damages, the court ruled plaintiffs presented insufficient evidence to prove Mr. Montano's death was caused by the county's *de facto* policy, discussed *infra*.  Order Granting in Part Defendant's Motion for Judgment as a Matter of Law at 28–33, *Montano v. Orange County, Texas*, No. 1:13-cv-00611-RC (E.D. Tex. 13 Apr. 2015), ECF No. 219 (*Montano*, Rule 50(a)).

Five months later, in an equally detailed and comprehensive opinion, the court denied the county's Rule 50(b) JMOL motion (referred to as a renewed motion) and alternative new-trial motion.  For the Rule 50(b) motion, it ruled, *inter alia*, "the majority of [the county]'s arguments have either been waived by [the county]'s failure to preserve the issues [in its Rule 50(a) motion], or have already been ruled on in [the county]'s favor through prior Orders of this court".  Order Denying Defendant's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial at 1, *Montano v. Orange County, Texas*, No. 1:13-cv-00611-RC (E.D. Tex. 22 Sept. 2015), ECF No. 246 (*Montano*, Rule 50(b)).  For the jury's unconstitutional-condition-of-confinement finding, the court concluded: "Montano's death was the predictable result of a *de facto* policy that denied detainees adequate care for an indefinite period of time, evidently in hopes that the detainees would, in a sense, heal themselves".  *Id.*

7

at 6.  Likewise, the court was satisfied by the sufficiency of the evidence for pain:

> The jury heard ample testimony of what the various jailers and nurses did and did not do on a regular basis, and what the nurses did and did not do for Montano, from which the jury could conclude that the condition in which Orange County Jail held intoxicated detainees was the moving force leading to Montano's pain and suffering.

*Id.* at 10 n.4.

The new-trial motion was denied because:  the awarded damages were not excessive; the county waived any objections to verdict inconsistencies by failing to object while the jury was still empaneled, and, regardless, the verdict was neither irreconcilable nor inconsistent; the jury instructions were not erroneous; and the verdict was not against the great weight of the evidence. *Id.* at 15–17.

## II.

A party may move for JMOL after the nonmovant "has been fully heard on an issue during a jury trial".  Fed. R. Civ. P. 50(a).  The motion "may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment".  *Id.*  And, the court may defer ruling, as done in this instance. *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405–06 (2006) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2533, 319 (2d ed. 1995):  "Even at the close of all evidence it may be desirable to refrain from granting a motion for judgment as a matter of law despite the fact that it would be possible for the district court to do so.").

If the Rule 50(a) motion is denied, the movant may renew the motion after trial.  Fed. R. Civ. P. 50(b).  And, the Rule 50(b) (renewed) motion, "may include an alternative or joint request for a new trial under Rule 59".  *Id.*

No. 15-41432

The county maintains the court erred in denying its Rule 50(b) motion because there was insufficient evidence to support liability for an unconstitutional condition of confinement and damages for pain; alternatively, it contends the court erred in denying its new-trial motion.  Concomitantly, it challenges the basis for the awarded attorney's fees and costs.  On the other hand, plaintiffs contest the Rule 50(a) JMOL against wrongful-death damages.

A challenge to a JMOL ruling on an issue preserved in district court is reviewed *de novo*, applying the same standard applied by the district court.  *E.g.*, *Gibbs v. Grimmette*, 254 F.3d 545, 547 (5th Cir. 2001).  JMOL should be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue".  *Williams v. Hampton*, 797 F.3d 276, 282 (5th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)).

It goes without saying that the evidence must be viewed in the light most favorable to the nonmovant.  *E.g.*, *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004).  Moreover, consistent with the role of the jury under the Seventh Amendment to the Constitution, it is more than well-established that all reasonable inferences are drawn in favor of the nonmovant, with the credibility of witnesses and weight of the evidence being within the sole province of the jury.  *E.g.*, *Advanced Tech. Bldg. Sol., L.L.C. v. City of Jackson, Miss.*, 817 F.3d 163, 165 (5th Cir. 2016); *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 285 (5th Cir. 1999); *McCann v. Tex. City Ref., Inc.*, 984 F.2d 667, 672 (5th Cir. 1993).  The evidence presented at trial, including inconsistent testimony by witnesses for the county between that offered in a deposition and at trial, presents a classic example for why it is for the jury alone to judge the credibility of witnesses and weigh the evidence.

9

No. 15-41432

A.

As discussed, in denying the county's Rule 50(b) motion, the court stated, *inter alia*, that some of the county's contentions in the motion had "been waived by [its] failure to preserve" them in its Rule 50(a) motion. *Montano*, Rule 50(b) at 1. For example, as discussed *infra*, for the challenge to the jury's unconstitutional-condition-of-confinement finding, the court ruled the county had not presented in its Rule 50(a) motion a clear articulation concerning its having a legitimate governmental interest for its *de facto* confinement policy.

1.

Consistent with the below-quoted question to be answered by the jury in the verdict form, three elements must be established to prove an unconstitutional condition of confinement:

> (1) "a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights.

*Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 468 (5th Cir. 2015) (internal citation omitted). The three condition-of-confinement elements were fully stated for the jury in the first question on the verdict form:

> Do you find, from a preponderance of the evidence, that Defendant Orange County had a custom of holding incoherent pre-trial detainees suspected of being intoxicated on alcohol or drugs in the observation cell known as the "bubble," until either the detainee was able to communicate with officers sufficiently to allow the officers to fill out book-in paperwork, or until the next visit of a contract doctor occurred, and that this custom was not reasonably related to a legitimate governmental objective, that [the] Sheriff . . . knew or should have known about the custom and was deliberately indifferent, and that this custom was the moving force leading to inadequate medical care?"

10

In this instance, a mixed standard of review is required for the three condition-of-confinement elements. In its written Rule 50(a) motion, the county challenged the sufficiency of the evidence for the first element; but, as the court ruled, that motion did not preserve a challenge to the second or third elements.

The introduction to the seven-page motion—offered at the completion of plaintiffs' case and renewed at the close of all evidence—contended there was "no evidence of a constitutionally deficient policy, custom or practice of the [county] that was a moving force that caused the death of [Mr. Montano]". The legitimate-government-interest element was never mentioned, and the constitutional-violation element was not analyzed. The county erroneously asserts its passing mention of a "constitutionally deficient policy" was sufficient because the policy could only be "constitutionally deficient" if all three of the unconstitutional-condition-of-confinement elements were at issue. Rule 50(a) requires specificity for good reason. Its "'specific grounds' requirement [in subpart (a)(2), quoted *supra*] serves both to make the trial court aware of the movant's position and to give the opposing party an opportunity to mend its case". *McCann*, 984 F.2d at 672 n.6.

Along that line, we agree with the court's analysis, in ruling on the Rule 50(b) motion, that the "Rule 50(a) Motion did not clearly separate the points upon which [the county] requested judgment, did not delineate which of its arguments applied to which of Plaintiffs' claims, and blurred the lines of Plaintiffs' claims through its obtuse recitation of the case law". *Montano*, Rule 50(b) at 8. Because the second and third unconstitutional-condition-of-confinement elements were not preserved, as discussed *infra*, they are reviewed for a lower sufficiency-of-evidence threshold, explained below.

No. 15-41432

a.

Having preserved its challenge to the sufficiency of the evidence for the first element (the "condition or practice"), the county relies upon the absence of evidence of another death resulting from the challenged *de facto* policy, missing the crux of our court's test:  we weigh sufficient evidence *vel non* for policy implementation, not policy outcome.

A formal, written policy is not required to establish a "condition or practice".  As our court previously noted, "a condition may reflect . . . [a] *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice'".  *Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996) (en banc)).

In *Shepherd*, likewise involving a pretrial detainee, "a *de facto* jail policy of failing properly to treat [ill] inmates" was "reasonably infer[red]" through a county-commissioned report, a United States Department of Justice report, jail officials' affidavits, and other documentary evidence indicating inmates received "grossly inadequate" treatment—in that instance, for chronic illness. 591 F.3d at 453.  The same is true for the action at hand.

As plaintiffs contend, the consistent testimony of jail employees is sufficient to prove an established *de facto* policy.  Jail employees testified to familiarity with the Orange County Sheriff's Office Correctional Facility Operations Plan, which prescribed a guideline range of four-to-eight hours for detainee detoxification.  In contravention, the jail's explicit custom was to isolate seemingly-intoxicated detainees in the bubble, and to leave them there until either they became coherent and could be booked, or a contract physician visited.

In that regard, the sheriff and jail employees testified how long a detainee in Mr. Montano's condition would remain in the bubble: two employees, five days; one, five days, but sometimes nine or ten. One jail employee testified "as long as it takes" when deposed, then at trial changed his answer to "two, three, five days" or "as long as it takes to figure out what's going on", even as he recalled the four-to-eight-hours guideline. Another employee, after acknowledging familiarity with the four-to-eight-hours guideline, was reminded at trial of her deposition testimony that she kept detainees in the bubble "until they get through detoxing. I've had them there as long as a week". On cross examination at trial, she clarified that, saying "as long as a week" meant "two to five days". Offering a range of explanations and hedging on his familiarity with county policies at trial, the sheriff was reminded that, when deposed, he had testified pretrial detainees were left in the bubble between four to five hours, four or five days, or "until they detoxified". The jury could compare such testimony with that of the doctor testifying as a medical expert for plaintiffs: detoxification generally takes six-to-eight hours; and, if the process takes longer, serious complications can occur—including renal failure and death.

The county's *de facto* policy is even at odds with its own written policy. Its Correctional Facility Operations Plan provides "[c]orrections staff should attempt to use a guideline of four to eight hours for detoxification"—far shorter than "as long as it takes". While the county contends "jail personnel testified that the general guideline is more accurate for alcohol intoxication, which tends to wear off more quickly than drugs", a reasonable juror could note the lack of conclusive evidence that Mr. Montano was on any drugs, as well as the discrepancy between a few hours and "as long as it takes".

Similarly, a reasonable juror could note the discrepancy in Mr. Montano's two detention conditions, within one month of each other, for the

same assumed influence of bath salts. While he was placed safely in a restraint chair and monitored in September 2011, he was left, as described by the district court, to heal himself in the bubble that October. Particularly given the uniform assumption of bath salts' causing his condition, a reasonable juror could question why—given institutional memory that Mr. Montano calmed down within three hours during his first presumed bath-salts high in detention—would nearly four-and-one-half days of sustained symptoms not prompt further care in October?

The county emphasizes, as noted, that plaintiffs did not provide specific examples of other instances of detainees who suffered Mr. Montano's fate as a result of the *de facto* policy. But, as also noted, such specific examples are not required to meet the "condition or practice" element. In that regard, although "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate", the evidence was sufficient for a reasonable juror to infer a *de facto* policy that every seemingly detoxifying detainee was left in the bubble without emergency medical care. *Shepherd*, 591 F.3d at 454. Given the striking uniformity of the jail employees' testimony, further evidence was not required for a reasonable juror to infer a *de facto* policy for conditions or practices.

Similar to the challenge in *Shepherd*, plaintiffs do not challenge "the acts or omissions of individuals but the jail's system of providing medical care" to detainees who were seemingly detoxifying. *Id.* at 453. Although the *Shepherd* plaintiffs presented a broader variety of evidence than the uniform testimony of the sheriff and jail employees in the action at hand, the result is the same: the uniformity of the evidence allows a reasonable juror to infer a *de facto* jail policy. *Id.* at 453–54. Jurors heard consistent testimony that a given protocol was followed for every similarly-situated detainee.

14

No. 15-41432

b.

As discussed, the legitimate-governmental-interest element was not preserved through the county's Rule 50(a) motion; as noted, the element was not even mentioned.  Subject to the exception discussed below, an issue not presented until a Rule 50(b) motion is reviewed on appeal only under an abbreviated "plain error" analysis:  "[i]f any evidence exists that supports the verdict, it will be upheld".  *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (citing *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001)).  *Flowers* implemented the already well-established rule in our court that issues not raised in a Rule 50(a) motion are waived for future motions in district court; and, on appeal, are reviewed only under the above-referenced "any evidence" standard.  247 F.3d at 238.  In effect, the issue is being raised for the first time on appeal.  *Id.* (quoting *U.S. ex rel Wallace v. Flintco, Inc.*, 143 F.3d 955, 963  (5th Cir. 1998) (quoting *McCann*, 984 F.2d at 673)).

The above-referenced exception to the "any evidence" review is invoked when a nonmovant fails, in district court, to object to a new issue's being raised in a Rule 50(b) motion; in that instance, he does not benefit from the limited scope of the "any evidence" review on appeal.  Instead, when the waiver-bar is not raised in district court, the new issue in the Rule 50(b) motion receives *de novo* appellate review.  *See Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 247 (5th Cir. 2005) (newly-presented issues in a Rule 50(b) motion are reviewed *de novo* on appeal when the nonmovant fails in district court to object to their not having been presented in a Rule 50(a) motion); *Deffenbaugh-Williams*, 188 F.3d at 284 n.5 (while new issues may not be raised in a Rule 50(b) motion, they "may be considered [on appeal] where . . . the non-movant does not object" to them in district court); *Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996) ("Because the

plaintiffs did not raise the waiver bar in opposing the rule 50(b) motion, they may not raise that bar on appeal.").

In response to the county's Rule 50(b) motion, plaintiffs objected to the Rule 50(a) motion's analysis of the second and third unconstitutional-condition-of-confinement elements as insufficient to preserve them for review through the Rule 50(b) motion. Because nonmovant failure to object is not at issue, the "any evidence" standard applies.

Therefore, at issue is whether the record contains any evidence that supports the jury's finding the county's *de facto* policy was without a legitimate governmental interest. Concerning that element, "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, or that confinement of such persons pending trial is a legitimate means of furthering that interest". *Bell v. Wolfish*, 441 U.S. 520, 534 (1979). Nevertheless, pretrial detainees reserve a "right to be free from punishment [and] an understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point". *Id.*

A properly-stated condition-of-confinement claim is not required to demonstrate actual intent to punish; intent may be inferred from an entity's decision to subject pretrial detainees to an unconstitutional condition. *Shepherd*, 591 F.3d at 452. A county allowing a staph infection to persist within a jail, for instance, serves no legitimate government purpose. *See Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 207 (5th Cir. 2011). In contrast, body-cavity searches of pretrial detainees are reasonably related to a legitimate government interest in secure facilities, as are cell searches. *Bell*, 441 U.S. at 555–60.

In evidence was the earlier-described affidavit of probable cause, signed by the county judge on 7 October 2011, nearly four-and-one-half days prior to

Mr. Montano's death, setting bond at $200 and ordering Mr. Montano be released after 72 business hours if charges were not filed or bond posted.  At the least, a reasonable juror could infer that the 72-business-hour limit should have put the county on notice that time limits were required and "as long as it takes" was unacceptable.  In other words, this prescribed time constraint could allow a reasonable juror to determine the county's "four to five days" or "as long as it takes" *de facto* policy for holding seemingly detoxifying pretrial detainees was not reasonably related to a legitimate government interest.

While the county points to testimony that the policy was related to governmental interests concerning security and pretrial detainee safety, a reasonable juror could find the evidence fails to justify the length of time Mr. Montano was held in the bubble.  In any event, the evidence in the record, such as the LVNs' and jail officials' testimony and the affidavit of probable cause, more than satisfies the abbreviated plain-error inquiry (any evidence supporting the verdict) for the unpreserved legitimate-government-interest element.

c.

In the light of our holding a reasonable juror could find that a *de facto* policy existed to isolate seemingly-intoxicated pretrial detainees in the bubble, and to leave them there until either they became coherent or a contract physician visited, and that the policy served no legitimate government interest, the remaining question is the third element:  whether that policy caused a violation of Mr. Montano's constitutional rights.  As discussed above, those rights include a pretrial detainee's not being punished.

The county contends its Rule 50(a) motion preserved the issue of whether the *de facto* policy caused a violation of Mr. Montano's constitutional rights; but, after a passing mention in the opening paragraph of the county's motion that the *de facto* policy did not cause his death, it failed to mention other clearly

violated constitutional rights, such as a pretrial detainee's not being punished. Moreover, the county offered no substantive discussion of evidence (or its lack) on the issue. The issue was not properly preserved. Accordingly, as discussed, the denial of its Rule 50(b) motion on this element will be upheld if any supporting evidence exists. *Allstate*, 802 F.3d at 674. Supporting evidence more than exists; it is voluminous.

When a government policy serves no legitimate government interest, curtails an individual's caring for himself, and denies him medical care, that government

> transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, *but from the limitation which it has imposed on his freedom to act on his own behalf.*

*Shepherd*, 591 F.3d at 453–54 (emphasis added) (quoting *Hare*, 74 F.3d at 639) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 200 (1989)).

There can be no denying Mr. Montano was punished. The record demonstrates the county denied him medical care with the expectation that he would heal himself. Witnesses testified the county failed to check his vital signs more than once in almost four-and-one-half days. The county disregarded state standards to search the Texas mental-health-treatment database for pertinent records that would have pointedly informed responsible care. Despite knowing Mr. Montano hardly ate or drank for almost four-and-one-half days, the county did nothing more than continue depositing food in the bubble. The evidence shows there was no mistaking Mr. Montano's dehydration: one observing LVN testified, "every time I tried to give [water]

18

to him, he would take a sip and then throw it on the wall and say it was poisoned".

These denials were not the result of negligent staff—as the county maintains, seeking to avoid liability—but the result of the county's well-known and uniformly-practiced *de facto* policy. While the county asserts its bubble and related policies existed to promote safety, the county never addresses why detainees were expected to heal themselves, particularly when the assumed drug influence was never established. In short, there was evidence that the policy was the moving force for Mr. Montano's inadequate medical care.

His death resulted from the staff's inaction, which was a direct result of the county's *de facto* policy. The registered nurse, appearing as an expert witness for plaintiffs, testified that the delay of care caused the death. The reality of the county's *de facto* policy is best characterized by the trial testimony of an LVN for the jail. After reading from the earlier described Orange County Sheriff's Office Correctional Facility Operations Plan, which stated, "Corrections staff should use a general outline of four to eight hours being required for detox", she testified to the county's standard deviation from its own plan: "And that, again, is the policy that's stated in the handbook for Orange County. But in truth, the custom and practice was you put a person in the detox cell; and you might leave them five or six days, depending on their condition".

In sum, for the unconstitutional-condition-of-confinement claim, the court properly denied the county JMOL against the jury's finding the condition. Trial testimony adequately established the protocol exercised in Mr. Montano's experience was standard jail practice; the record demonstrates his experience was not a mere "isolated example", but was, instead, a "pervasive pattern of serious deficiencies in providing for his basic human needs". *Shepherd*, 591 F.3d at 454.

No. 15-41432

2.

The county also maintains the court improperly denied its Rule 50(b) motion regarding the $1.5 million awarded for pain Mr. Montano suffered. The jury found the violation of Mr. Montano's constitutional rights caused pain. (It did not find the violation caused mental anguish.) The county asserts there was no evidence of causation or of Mr. Montano's consciously suffering pain, and no evidence to justify $1.5 million as fair and reasonable compensation for any pain suffered. But, much of the county's assertion that Mr. Montano did not feel pain is predicated on the bath-salts theory, which the jury was not required to accept.

a.

As for causation, the court's JMOL-denial concluded, "[u]nlike wrongful death damages, Plaintiffs need not prove cause of death to recover damages under Texas's statutes providing for survival claims". *Montano*, Rule 50(a) at 33 (citing *Pluet v. Frazier*, 355 F.3d 381 (5th Cir. 2004)). The county contends the court erred in applying different causation standards for pain versus wrongful death, asserting the causation test is the same for both statutes.

For assessing the sufficiency of evidence on this issue, state law is referred to for "the kind of evidence that must be produced to support a verdict". *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004) (quoting *Ayres v. Sears, Roebuck & Co.*, 789 F.2d 1173, 1175 (5th Cir. 1986)). Texas law permits juries to conclude from "general experience and common sense" that someone suffered pain. *Hamburger*, 361 F.3d at 884 (applying Texas law). In Texas, as the district court noted, "[a] jury has wide discretion in considering circumstantial evidence of pain and suffering and arriving at a sum". *Montano*, Rule 50(a) at 33 (citing *Lee Lewis Contr., Inc. v. Harrison*, 64 S.W.3d 1, 14 (Tex. App. 1999)).

We agree with the court's analysis.  Plaintiffs were not required to prove Mr. Montano's detention caused his death in order to recover damages for pain; rather, they were required to prove the detention caused pain.  *See Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1092–93 (5th Cir. 1988) (evaluating evidence of causation between a defective design and pain and suffering after a shipwreck); *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 464 (Tex. 2005) (requiring evidence of causation between a fuel system design defect and suffering during a car fire); *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511–12 (Tex. 1995) (requiring evidence of causation between a negligent surgery and continued pain); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993) (requiring evidence of causation between a medical misdiagnosis and continued pain and suffering).

The county analogizes to a jury accused of "simply pick[ing] a number", implying that occurred here.  It further claims insufficient evidence of subjective pain because Mr. Montano was allegedly unconscious or not in pain while in the bubble.

Pain and suffering recovery must be premised on conscious experience. *See Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1428 (5th Cir. 1992) (interpreting Texas law).  The jury was instructed: "'Pain and mental anguish' means the conscious physical pain and emotional pain, torment, and suffering experienced by Robert Montano before his death as a result of the occurrence in question".  Akin to the county's not objecting to that instruction at trial, it is not challenged on appeal.

The court further noted the jury took in "days of evidence" about Mr. Montano's behavior.  *Montano*, Rule 50(a) at 33.  The report of the Texas Ranger who investigated the death scene noted statements from inmates that Mr. Montano "hollered" and asked for help.  As discussed *supra,* the LVN who heard Mr. Montano say "come in" testified she did not consider acting on his

request, and chose to keep it to herself until the Ranger's postmortem investigation. (As noted, on the second day of her testimony, that LVN testified she never heard Mr. Montano say "come in".) Moreover, the county concedes the inmates' statements demonstrate Mr. Montano was conscious when yelling in the bubble.

The county attempts to tie that consciousness to assumed drug use; but, once again, there is no confirmation whatsoever in the record that Mr. Montano was under any drug influence. How and why Mr. Montano was conscious was a matter for the jury to decide. Likewise, the jury heard testimony from an LVN that Mr. Montano exhibited purpling signs of renal failure, and that other inmates showing such signs required emergency medical treatment. Moreover, the doctor who performed the autopsy on Mr. Montano—whose video-recorded deposition plaintiffs played for the jury—testified such purpling was indicative of death's imminence within 12-24 hours.

The record reflects Mr. Montano's moans, asking a nurse to come in the bubble, and most pointedly, the ultimate cause of death—renal failure. Whether this evidence demonstrated that Mr. Montano suffered pain was a matter for jury determination. Considered in concert, a reasonable juror could find Mr. Montano consciously suffered pain.

b.

As for the challenged amount of the award, courts may find excess on two grounds. The first ground—excessive compared to other awards for similar facts—does not apply here; the parties concede there are no comparable jury verdicts involving pain-and-suffering damages within our circuit, nor do we find any. *See Vogler v. Blackmore*, 352 F.3d 150, 158 (5th Cir. 2003).

The second ground is that the award "shocks the judicial conscience". *Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008). The jury awarded $1.5 million for pain. Given the evidence presented, the award does not "shock[]

the judicial conscience". *Id.* at 503–04 (affirming $10 million jury award for past, present, and future pain and suffering for plaintiff's severed spine and permanent loss of sensation below the neck).

3.

The county also challenges the denial of its alternative, Rule 59 new-trial motion. *See* Rule 50(b) (alternative to JMOL). Its grounds for that motion were excessive damages; contradictory findings; erroneous verdict-form standards; insufficient evidence; and, overall, the verdict was against the weight of the evidence. On appeal, the county presents only two of those grounds: excessive damages; and irreconcilable jury findings.

The denial of a new-trial motion is reviewed for abuse of discretion. *E.g.*, *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 300 (5th Cir. 2005). A district court has discretion to grant a new trial under Rule 59(a) "when it is necessary to prevent an injustice". *United States v. Flores*, 981 F.2d 231, 237 (5th Cir. 1993) (internal quotation marks omitted). For the following reasons, the new-trial motion was properly denied.

a.

Concerning the excessive-damages ground, a court abuses its discretion in denying a new-trial motion based on evidentiary grounds when "the verdict is against the great weight of evidence". *Int'l Ins. Co.*, 426 F.3d at 300 (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)). In the light of our holding the evidence was sufficient to support the jury's finding an unconstitutional condition of confinement and damages for pain, along with its finding for wrongful-death damages (discussed below), the court

No. 15-41432

did not abuse its discretion in denying a new trial based on the excessive-damages contention.

b.

Regarding the county's assertion that the court erred in denying the county's new-trial motion based on irreconcilable jury findings, the court ruled the county waived this contention because it made no objection to any alleged inconsistencies in the jury verdict before the jury was discharged. *Montano*, Rule 50(b) at 16. Along that line, objections to alleged inconsistencies between a general verdict and answers to verdict questions are waived if a party fails to object when the jury announces the verdict, while the jury is still empaneled. *See DiBella v. Hopkins*, 403 F.3d 102, 117 (2d Cir. 2005); *Mason v. Ford Motor Co.*, 307 F.3d 1271, 1275–76 (11th Cir. 2002); *Howard v. Antilla*, 294 F.3d 244, 250 (1st Cir. 2002).

While waiver would not apply had the jury given a special verdict, the verdict in this instance was general. *See Alvarez v. J. Ray McDermott & Co.*, 674 F.2d 1037, 1040 (5th Cir. 1982). The county's contention regarding an allegedly inconsistent verdict was not properly before the court, and is not properly before us.

4.

In challenging the award of attorney's fees and costs, the county does not contest their amount. Instead, it understandably requests that the award be vacated if judgment is rendered for the county. Because 42 U.S.C. § 1983 liability and damages are upheld, plaintiffs remain the prevailing parties and are entitled to those fees and costs. *E.g.*, *Maine v. Thiboutot*, 448 U.S. 1, 9 (1980).

B.

Plaintiffs contest the court's granting the county's Rule 50(a) motion against the awarded wrongful-death damages. "[A] plaintiff seeking to recover

on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute". *Phillips ex rel. Phillips v. Monroe Cty., Miss.*, 311 F.3d 369, 374 (5th Cir. 2002).  Our having held the requisite constitutional deprivation was sufficiently proved, at issue is whether plaintiffs proved the causal link between the county's unconstitutional policy and Mr. Montano's death, as prescribed by Texas law.  *Id.*

Texas law defines wrongful-death claims by statute, but causation by common law.  *See Park Place Hosp.*, 909 S.W.2d at 511; *see also* Texas Wrongful Death Statute, TEX. CIV. PRAC. & REM. CODE §§ 71.002, 71.004.  "The ultimate standard of proof on the causation issue 'is whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred.'"  *Park Place Hosp.*, 909 S.W.2d at 511 (quoting *Kramer*, 858 S.W.2d at 400).

Regarding whether the county's unconstitutional treatment was a substantial factor leading to Mr. Montano's death, without which his death would not have occurred, it is not necessary to look further than the county's closing argument.  "[A]n attorney's remarks, made in closing, constitute[ ] binding admissions against the party he represent[s]".  *Saucier v. Plummer*, 611 F.3d 286, 288 (5th Cir. 2010) (quoting *Dillon v. Wal-Mart Stores, Inc.,* No. 97-20613, 161 F.3d 8, at *2 (5th Cir. 1998) (unpublished)).

At closing, the county stated:  "[Mr. Montano] died because of medical negligence".  (This admission came amidst the earlier-referenced dispute at trial whether the negligence stemmed from LVN negligence or a condition of confinement; in the light of our holding the latter took place, that dispute is now immaterial.)  The county further acknowledged "Robert Montano died

while he was in the custody of the Orange County Jail.  We've stipulated that fact.  The death is on our hands. . . . We know that Mr. Montano's death was a tragic mistake, negligence, maybe even gross negligence".  The county's concession is a binding judicial admission.  *See Saucier*, 611 F.3d at 288.  That admission satisfies Texas' above-described "ultimate standard of proof" for wrongful-death causation:  whether the negligent omission was a "substantial factor in bringing about the harm and without which the harm would not have occurred".  *Park Place Hosp.*, 909 S.W.2d at 511 (quoting *Kramer*, 858 S.W.2d at 400).

In granting the county's Rule 50(a) motion on wrongful-death damages, the court stated: "[The county] did not concede that *Orange County Jail's condition of confinement* caused Robert Montano's death".  *Montano*, Rule 50(a) at 28 (emphasis added).  But, the county did concede that Mr. Montano's lack of medical care caused his death.  And that lack resulted directly from the county's *de facto* policy's being followed.  Because the constitutional deprivation is well established and the causal link was admitted at trial, satisfying Texas' causation standard, the standard for wrongful-death damages is satisfied.  *See Phillips ex rel. Phillips*, 311 F.3d at 374; *Park Place Hosp.*, 909 S.W.2d at 511.  JMOL was improperly awarded the county on wrongful-death damages.

A related issue is presented on appeal by the county's raising the possibility that Mr. Montano was so ill he would have died even with appropriate medical care.  This contention fails in the light of the county's contradictory binding judicial admission that Mr. Montano's "death [was] on [its] hands".  In the alternative, this claim was not preserved in district court.  For that reason alone, it will not be considered on appeal.

In that regard, the county's Rule 50(a) motion stated that plaintiffs produced no evidence that Mr. Montano's condition was treatable and

No. 15-41432

survivable; but, that assertion was contingent on the unproven bath-salts theory:

> The undisputed evidence is that Plaintiff's decedent died from the toxic effects of the ingestion of an illegal substance, bath salts, and no evidence that the renal failure that precipitated his death was a condition that could have been known, or was known by Orange County or, more importantly, that the condition was treatable and survivable.

Had the county presented such an assertion at trial that was not based on the underlying bath-salts premise, plaintiffs would have had opportunity to offer evidence that the court, post-verdict, stated was missing in granting the Rule 50(a) motion against wrongful-death damages, such as the "etiology of renal failure, the disease's normal course in forty-one year old males like Mr. Montano, or likely outcomes of various treatment modalities". *Montano*, Rule 50(a) at 28.

## III.

For the foregoing reasons, the judgment is AFFIRMED, except for the JMOL against the wrongful-death damages in the amount of $917,000; that part of the judgment is VACATED; and this matter is REMANDED to district court for entry of an amended judgment consistent with this opinion.